Good morning, Your Honors. If it pleases the Court, my name is William Carroll. I represent defendant and appellant in this case, Mitchell Celaya, former Chief of Police at the University of California, Berkeley. With the Court's permission, I'd like to reserve three minutes for rebuttal. All right. Please watch your time. Yes, Your Honor. Your Honor, the District Court erred in denying Chief Celaya's summary judgment on his qualified immunity defense because plaintiffs failed to adduce specific, non-conclusory facts showing that he acted with retaliatory motive in deciding to transport 66 arrestees from Wheeler Hall to Santa Rita Jail for processing, booking, citation, and release. Now, this Court has jurisdiction to hear this interlocutory appeal under Jeffers v. Gomez. Can I ask you which arrestees we focus on for purpose of this appeal? It's a putative class action, but it was not yet certified. So isn't the issue only whether there is evidence of discriminatory intent with respect to the four named plaintiffs? That is correct, Your Honor. So not the other 62 at the moment? They are not at issue. Okay. And so don't we take the facts in the light most favorable to those plaintiffs? And if we do that, doesn't that leave us with a constitutional claim? A constitutional claim? Of retaliation in violation of the First Amendment? It doesn't leave us with a denial of qualified immunity if we read the facts in favor of the plaintiffs. Okay. So in terms of qualified immunity, the district court said that there were material issues of fact that prevented a determination of qualified immunities. What's your response to that? Jeffers v. Gomez. Jeffers v. Gomez established in this circuit that where the conduct itself is not disputed, but the motive is in the words of the court where the conduct is undisputed, but there is a dispute as to whether motive X, which would render the conduct unconstitutional, or motive Y, which would render the conduct constitutional. When that's in dispute, the court has jurisdiction to review on an interlocutory basis whether there is sufficient evidence of motive. Okay. So let's assume that we do have that jurisdiction. I think what Judge Rawlinson was asking, at least what I want to ask, is why isn't there a dispute of fact in this case as to whether or not your client had a retaliatory motive? There are a number of e-mails which are in the record. There's at least as to three of the plaintiffs a departure from the policy that had been put in place before, as to the fourth one, it appears to follow the policy. And there's some evidence that he played a hand in changing the policy relatively late on in the process. When we put all those together, could a reasonable juror infer from that that your client had a retaliatory motive? The answer is no, Your Honor. The standard whether a reasonable juror could draw an inference of retaliation is relevant here. It also occurs in a certain context, however. The context is what the Jeffers Court referred to as the specificity requirement. But there are very specific e-mails here. I mean, it's not that they say, I heard he send an e-mail. We have copies of the e-mails. We have the chronology which is not disputed about how the policies were put together and then later not followed with respect to three of the plaintiffs. So there are particular facts. My question is why aren't those particular facts enough for us to infer a retaliatory motive? The short answer is because those specific facts do not give rise to any reasonable inference of retaliation in the context that we are dealing with here. Why not? Why not? Okay, that could be a long answer, Your Honor. But it's a central question in this case, so give us the answer. It is indeed. So the evidence that has been tendered of retaliatory motive basically consists of three e-mails and then what we view as a fairly pale attempt to impugn Chief Zelaya's credibility in terms of the explanation of why he made the decision to transport the arrestees. As far as the e-mails are concerned, and the other— Before you go on, do we pay any attention in this case to his explanation? In other words, we have to view the evidence in the light most favorable to the plaintiffs in this case, and therefore his explanation may or may not be believed. We're not here to do credibility on his explanation. We're here to look at the facts that they have to see whether they suggest a retaliatory motive. And it is clear that that credibility inquiry, to the extent that it's relevant, and we don't argue that it's irrelevant, but it is clear that under the Supreme Court's decision in Crawford, L.V., Britain, as referenced in subsequent cases in this circuit, that an attack on credibility in itself cannot be enough to fulfill that burden. We see it as being of marginal relevance, and we have some, I think, very specific points we want to raise about why the attacks on credibility are ultimately futile. But putting those to one side, we are talking about three emails and an argument that Chief Celaya failed to make every effort to transport the arrestees to Santa Rita. But these occur in a context, too, Your Honor, and I want to make clear what that context is. It is undisputed that Chief Celaya approved an operational plan on Thursday night, and this is after three full days, four full days of an occupation, where, as the district court concluded, there was an arc of tolerance during this entire period on the part of UCPD and the crisis management team on campus. So what we have here is a decision by the campus, supported by Chief Celaya, to allow the protesters to fully occupy Wheeler Hall during the time periods when Wheeler Hall was open. And that period then culminates on Wednesday when there's an announcement that an all-night concert is going to be held inside Wheeler Hall on the eve of finals, which are to begin on Saturday morning at 8 a.m. That's the context here. Wasn't there evidence that they were allowed to occupy the building even after closing hours? That issue was resolved by the district court. It goes to the question of permission and license. That was an inquiry on the Fourth Amendment claim. The district court ultimately concluded that there was no permission, properly concluded that there was no permission, and that, therefore, there was probable cause to support these arrests on Friday morning. But getting back to the context, the point that I think is important to make is that there's no dispute that Chief Celaya had adopted the plan, approved the plan, to field-site the arrestees inside Wheeler Hall as of Thursday night. That was the plan. There's no dispute about that. And there's also no dispute that with respect to these four plaintiffs, that plan was not followed. Or at least, as the three of them, it was not followed, because one of them probably fell within the plan's description of transporting. That's correct, Your Honor. So the question is, what happened between Thursday night when the plan was adopted, and I'm talking about the three plaintiffs who were part of the larger group who were transported in buses. What happened between Thursday night and Friday, where Chief Celaya suddenly developed this retaliatory motive and decided to ship off the arrestees to Santa Rita? There is no answer to that question. There is no evidence in the record to support. But do we have to—you see, that's what troubles me about your position. We don't have to conclude that the motive was suddenly arrived at between Thursday and Friday. We can look at the record and see whether or not there's sufficient evidence to support an inference that he never intended to follow the plan or that he had a retaliatory motive and at the end of the day he departed from the plan because of it. Why does he have to develop the motive between Thursday night and Friday? Because we're looking at this as a rational juror would look at it, Your Honor, and there needs to be a rational explanation for where this retaliatory motive materialized. There can be more than one rational explanation. That's why you have a jury, so the jury can sort among the various rationales that support the behavior, right? Correct, Your Honor. The point that I would like to make is that there is an evidentiary void as to anything that could have prompted Chief Celaya to change his mind and decide that he was going to punish these protesters and ship them off to Santa Rita. But doesn't that support the district court's determination that there are material issues of fact that remain to be resolved before the issue of qualified immunity can be arrived at? There has to be something to fill that evidentiary void. And the only thing that plaintiffs point to are, again, three e-mails, which I'd like to address, and, again, this notion that Chief Celaya failed to make every effort to field-cite the arrestees. So as far as the e-mails go, I do want to talk about them because I think they actually undercut the notion that Chief Celaya had a problem with the political message of the protest, the content of the speech that the plaintiffs argue prompted the retaliation here. So if we look at the first e-mail, it was sent at the first day of the occupation, and Chief Celaya is responding to a professor who's expressing a concern, saying, essentially, look, I heard that you were shutting down Open University. And this is the one at ER 119? 119, I think. Yeah, 119. You're more fluent with the English language than I am. So Chief Celaya, it's an important e-mail, I think, because Chief Celaya is, in this e-mail, he acknowledges the legitimacy of what the protesters are doing. He acknowledges that we are not trying to shut down Open University. He's acknowledging that, yes, we are allowing these people to occupy Wheeler Hall, the largest classroom building in campus, who had no authorization to come in and open their Open University. We are going to allow that. And he goes on to say that it is appropriate to engage in education and teach-ins as part of Open University during the hours that it is open. Now, he raises some question about whether people will adhere to those hours, and he gets into some consequences about what might happen if they do not adhere to the open hours and they start to trespass. Well, there is nothing retaliatory about expressing concern about breaking the rules and breaking the law. So we have here two things in this e-mail, Chief Celaya affirming that, in his view, it was appropriate to engage in these education and teach-in activities, which are the political message here. And I know you're running out of time here, and I'd like to hear you address the final e-mail in the chain, the one that says, I guess now they won't be able to get back to rallies. Okay. That seems to me to be the most damning. Maybe it's not, and I know you weren't running out of time, and I do want you to address it. Yes, Honor. Thank you for that question, Your Honor. So this is the e-mail that occurred after the operation was complete. And so he wrote this e-mail some five hours after making the decision to transport the arrestees to Santa Rita. So it's – But isn't it indicative of his intention at the time that he brought the arrestees to Santa Rita? Not at all. It provides no evidence whatsoever of his motive in bringing them there? Well, he – at the time that he made the decision to transport them, he didn't know there was going to be a rally that was planned for Wheeler Hall at noon. That's number one. Number two, if he wanted – the premise of the argument itself is highly questionable because there – he was – the decision was to send these folks to Santa Rita, not to – you know, not halfway across the country. They were going to be there for a few hours. They were going to be able to come back and participate in any protests that they wanted to. So it's simply implausible to suggest that that was the motivation to – So what's the portent of the sentence that reads, the good news is that the arrested protesters are still at Santa Rita getting booked, so they won't be able to participate in the rally. What are we to make of that sentence? In two words, crowd control. He's expressing in this, we are staffing this to monitor the rally. We don't know how many people there are. There may be more coming. We don't know how many officers it's going to take. The good news is we're going to have fewer people who are going to be at this rally. Is that the only fair reading of that sentence? In the context, I believe the answer to that is yes, Your Honor. I do want to reserve some time for rebuttal. All right. Thank you, counsel. Good morning. Good morning. May it please the Court, my name is Dan Siegel. I represent the appellees in this matter. Counsel for Chief Celaya appears to be making a final argument to the jury. He is attempting to persuade the court of the merits of his client's position, and in doing so, he addresses the evidence that demonstrates his client's liability. It's very clear that Jeffers v. Gomez has not created a rule whereby the court, this court, will review factual decisions made in the context of denying qualified immunity on summary judgment. I would submit to the court that the Jeffers decision is not a complete model of clarity, but what it says is that where an issue in the qualified immunity determination is the intent of the state actor, and where there is no evidence, and that's a quote of Jeffers, if there is no evidence to demonstrate that the state actor's intent was the one required by the claim brought against him or her, then the appellate court may review the trial court. Excuse me. I want to, if you can for a moment, focus on the lead plaintiff. I'm sorry? Focus on the lead plaintiff, Ms. Madoff. She's in a, as the district court recognized, facts of her case are different than the other three. Correct. The university did not depart from the operation, from the special policy, whatever you call the last thing in the chain, the policy that they came up with respect to her. She was booked because she had a prior incident. She was booked at the Santa Rita station. The other three should not have been under the policy. So what do you contend was the retaliatory action with respect to her? Well, Your Honor, she was transported in accordance with state law. State law surely allowed her to be. Yeah, well, I've read the California statute. You don't have to take it at the scene. You can take it at the station. So no state law was broken. No operational policy was broken. The district court opinion says she was taken immediately to Santa Rita, not held someplace in the meantime. Tell me why there's enough evidence to go to the jury on retaliation as to her, not everybody else, but just as to her. Your Honor, I believe that all of the evidence regarding Chief Celaya's discriminatory intent, except for his last-minute decision to violate the agreement that had been imposed by the crisis management team the preceding evening, applies to Ms. Madoff. But let's go backwards then. If you cut it off at the time that the plan is adopted for a second, because he complies with the plan thereafter, what's the evidence that the plan was put together as a retaliatory motive? I mean, when I look at the evidence, it says, as to some of these folks who've been apprehended before, we don't know whether they violated their terms, so we'd like to book them in accordance with California law at the station if people are first-time offenders, we'll just ticket them at the scene. Why is that a retaliatory plan? Because it singles out individuals for harsher treatment because of their prior First Amendment activity. Doesn't it single them out because of their prior arrest, not their activity? No, it's not saying we'll find people who've protested in the past and send them to the station. It says we'll find second offenders, and if you're a second-time offender, we'll send you to the police station. What's wrong with that? Your Honor, I understand the court's question. It doesn't single them out based upon prior arrests because there's no determination as to whether, with respect to all of the arrestees, they had prior arrests. So you're arguing they didn't send enough people to Santa Rita? Certainly your client, whoever else is here, your client had a prior arrest. A particular prior arrest. That's the distinction I'm trying to make here. The issue is not whether a arrested protester had a prior arrest. The issue that allowed or justified this crisis management team in making the distinction that you're pointing out was whether any of the individuals arrested on December 11th had also been arrested on November 20th. I understand your point. Let me tell you what troubles me, and maybe you can help me with it. Okay. As to Ms. Madoff, your argument is this was a discriminatory plan. Correct. As to the other three people, your argument is they didn't comply with the plan. In part, right, because they were transported and the plan didn't call for them to be transported. Can you have it both ways? Yes. Okay. So not complying with a plan that's discriminatory is itself discriminatory. If I can try to untangle that a bit. Please. Let me take a minute. Okay. So first of all, beyond the four discriminatory statements which we think showed Chief Celaya's intent, particularly the last one that Judge Rollinson identified, we claim that the evidence of his discriminatory intent consisted of his disregard of the policy underlying the penal code section on cite and release. I mean, I understand that that section did not strictly require cite and release. In fact, it says the arresting officer has the discretion to cite at the scene or book at the station house, it says. That's right. So nobody can contend that the state statute wasn't complied with here. You're not contending that, are you? I think there's a policy inherent in the state statute that favors the quickest resolution of an individual's arrest status. What do you do with subsection G then, which says the officer is not required to cite at the scene but can cite at the station house? Again, I understand that requirement, and I'm not saying that failing to cite and release violates the penal code. What I'm saying is failing to cite and release violates the spirit of the penal code. That penal code section and the University of California policy both express a preference for cite and release versus longer determination. And just as a footnote to that point, Your Honor, taking someone to the jail at Santa Rita is not the equivalent of citing and releasing at the station house. The station house at the University of California is in the basement of Sproul Hall. Santa Rita is a county jail 30 or so miles away. It's not a station house. But isn't this the chief of police's call? This is in his province. The law explicitly gives him the option. How can we sanction him for choosing an option in these volatile, fast-moving circumstances that the law permits him to do? The law in this circuit, if I may so contend, going back at least 40 years, is that even when probable cause for an arrest exists, a police officer's choice to make an arrest or to handle an arrestee in a certain manner may be a violation of the First Amendment if it can be established that that choice was influenced not by legitimate law enforcement concerns but by the state actor's antipathy towards the First Amendment speech. And that's what we think occurred here. And that's why we think that the chief's prior four statements demonstrate intent. What happens when there's a mixed motive? Let's say the decision is motivated 80% by his concern that this situation might get out of hand, the outsider showing up, they're partying, they're drinking, they're occupying one of the important buildings on the campus, and it's 10% by the fact that he may not like demonstrators in his buildings. Your Honor, my response to your question is that that's a jury question. The jury instructions, which are in somewhat of a state of flux in this area, require the plaintiffs to prove that the decision was based upon the substantial cause of the decision was the retaliation or even a but-for cause. And so the ultimate finder of fact in this case is going to have to decide whether Chief Celaya made the decision for the types of reasons that you outlined in your question or whether he made it for retaliatory reasons. But let's go back to comparison here. If you were advising Chief Celaya on the afternoon before the students were arrested about whether he could transport people with prior arrests to Santa Rita but ticket other people on the scene, what would you tell him? It seems to me you would say you can't do that because that would be discriminatory. That's the crux of your Madoff case, is it not? Correct. So he says, okay, I won't do that. I'll take everybody because I'm not allowed to single out those who have spoken before, so I will just take everybody and comply with California law on them, and I'll stay out of trouble. What's wrong with that? Well, what's wrong with that is that Chief Celaya is not an independent actor. He's not the police chief of Berkeley or Oakland or the head of the highway patrol. He is an employee of the University of California, which has decided to appoint a crisis management team which consists of Which presents him under your scenario with an unconstitutional plan. Right, because if you take the prior arrestees to jail, it violates the Constitution. And so what if he correctly, in your view, in the afternoon says, I can't do that. I don't want to book everybody here, so I'll book everybody there. What's wrong with that? One thing is the record is devoid of what conversations occurred in that team. No, I understand. The end result is to come up with a plan that treats everybody the same. And so it's a little bit strange for you to say, no, no, we want a plan that treats people differently because that's the one we want them to comply with, but I'm going to make a claim against them for treating somebody differently. If I were a member of the crisis management team, which I think you're inviting me to play that role, I would say, look, we had a demonstration here two weeks ago on November 20. We were afraid that things would get out of hand when we arrested the people occupying the building. What we decided and what we did was to cite and release everyone in the basement of the building. They left after being cited and released and everything was peaceful. So that seemed to be a good plan. So I think we should do the same thing here where, despite the fact that there was this occupation of the building for four or five days, the students and others were peaceful. They were respectful. They cleaned up after themselves. They went out of their way to avoid any. But they still, you're not contesting that they shouldn't have been arrested or cited, are you? I am. You have an uphill battle. You're going to say that they were obeying the law and doing nothing wrong. No. If you engage in civil disobedience, you expect something to happen. Correct. And it did. So we start with the premise that the police officers were entitled to cite your clients, no matter how respectful and nice they'd been beforehand. The question is where they book them. That's the only question. I thought I was responding to a different question as to what plan I would have advocated as a university official participating in the crisis management team. I would have said, given our experience only two weeks ago and given the evidence which does not show a propensity on the part of this group of protesters to do anything untoward, I think we should simply do what we did two weeks ago, cite and release all of them. Maybe someone else argued, well, we have these recidivists who are overly inclined to occupy campus buildings, so we'll send them to Santa Rita. So that was the decision that was made. I assume that was the decision that was made. What exactly was the constitutionally protected activity here? Of the students? Yeah. To protest cuts in the university budget and decisions that were made. And they can occupy the main campus facility after hours in violation of the rules, and that's entitled to First Amendment protection? Well, Your Honor, I think it's clear in the law that engaging in acts of civil disobedience is protected by the First Amendment. The fact that it's protected by the First Amendment doesn't mean that the individuals cannot be subjected to arrests or other sanctions for their free speech activity. Well, but sanctions here were being imposed in effect for violating the campus rule about remaining in the building, not for their First Amendment activity. Nobody who stood outside the hall and shouted whatever slogan was punished. It's only the people found inside the hall in violation of campus rules, right? Correct. So I liken this to the Civil Rights Movement, when people sat in at lunch counters because they weren't served due to the color of their skin. And they, of course, were arrested, but there was no question but that they were exercising their First Amendment rights to protest against segregation. How do we square those concepts? Well, first of all, Your Honor, I think that your analogy is completely correct and that individuals who, as I did, sat in at lunch counters and other places, did so with the understanding that we would be arrested. However, and this may be relevant to Judge Hurwitz's question about Ms. Madoff, if at the arrest at the lunch counter in Greensboro, North Carolina, Martin Luther King was there and everyone was arrested and cited out, but they sent Martin Luther King to the state penitentiary, I think he would have had a claim for being treated in a disparate manner because of his history and reputation for engaging in similar conduct in the past. And I think, Judge Hurwitz, I think that's an answer to your question about Ms. Madoff. All right. Thank you, counsel. You've exceeded your time. Okay. Thank you. Thank you. So many points and so little time. First, with respect to Judge Parker's question about mixed motives, the law is pretty clear here but for. That is, he could have had a range of motives, but the retaliation has to have actually prompted his decision to transport or else there's no constitutional violation. With regard to Mr. Siegel's point, the law, I think, on this point is clear. Breaking the law is not a protected First Amendment expression. So we cited cases in the brief that clearly acknowledge that, that the trespass itself here is not in a protected expression under the First Amendment. So the protected activity that's at issue here is the lawful expression of concerns about budget cuts. But there were mixed signals given by the administration in this case. The student, there were negotiations and the students were allowed to stay in the hall and then abruptly they were removed. How does that affect our analysis? Very little, I think, Your Honor. I mean, the court, the district court properly considered that evidence and concluded properly that there was no permission, there was no license. The fact that disbursement orders were given each and every night. But they weren't dispersed, though. That's the problem I'm having with the facts in this case. Even though disbursement orders were given, they were not effectuated. What the CMT was trying to do and what Chief Zelaya was participating in here, again, what the district court called an arc of tolerance. They were trying to allow the occupation to play itself out. That's what I call a mixed message. It is tolerance, Your Honor. But they wanted to make absolutely sure that everyone understood there was no permission to do a 24-7 occupation. But how do you say there is no permission but you allow them to stay? That's the difficulty I'm having. If you're telling the students you have to leave and they don't leave and nothing is done, how is that giving them the message that they don't have permission to stay? Because you have uniformed police officers come in and tell them in various locations throughout the building, you are not authorized to be here. You are in violation of student conduct rules. You are in violation of the law. But you can stay. That seems pretty clear to me, Your Honor. But we're not going to remove you. We're not taking action yet as long as you maintain the rules of engagement, as it were, which ended as of Wednesday with the announcement of the concert. But couldn't a reasonable jury look at that course of conduct and say that they were engaging in protected activity because they were allowed to stay? There were certainly aspects. We don't argue that there was no protected speech occurring here, Your Honor. What we're arguing is that Chief Zelaya had no problem with the lawful expression of the ‑‑ there's no evidence that Chief Zelaya had any problem with the occupier's goals of budget cutting, protesting the budget cuts. That's what we're arguing. I'm afraid my time has run out. It has, but thank you both for your helpful arguments. The case argument is submitted for decision by the court, and we are in recess until 4 o'clock.
judges: Parker, McKeown, Rawlinson